**SINCLAIR OIL CORPORATION, Plaintiff,**

v.

**ATLANTIC RICHFIELD COMPANY, Defendant.**

Civ. No. C–88–628W.

United States District Court, D. Utah, C.D.

Sept. 5, 1989.

Richard W. Giauque, Gary F. Bendinger, Scott M. Lilja, Salt Lake City, Utah, Melvin Goldstein, Washington, D.C., Dennis C. Stickley, Corporate Counsel, Sinclair Oil Corp., Salt Lake City, Utah, for plaintiff.

Robert A. Peterson, Salt Lake City, Utah, David L. Roll, Washington, D.C., for defendant.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

The court heard argument on defendant Atlantic Richfield Company's ("ARCO") motion to dismiss or for summary judgment on May 12, 1989. Plaintiff, Sinclair Oil Corporation ("Sinclair"), was represented by Richard W. Giauque, Melvin Goldstein, and Scott M. Lilja. Defendant, ARCO, was represented by Robert A. Peterson and David L. Roll. Prior to the hearing the court had reviewed the memoranda and exhibits filed by the parties. The court took the matter under advisement, and now being fully advised as to the facts and the law, the court renders the following memorandum decision and order.

## BACKGROUND

Sinclair filed this lawsuit on July 19, 1988 and is seeking treble damages for overcharges allegedly resulting from intentional violations by ARCO of the Economic Stabilization Act of 1970 (ESA), § 210, 12 U.S.C.A. § 1904 note, as incorporated by reference into the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 et seq., § 754(a)(1).

Pursuant to the EPAA, the Cost of Living Council[1] passed pricing regulations which precluded a refiner from charging "a price for a covered product in excess of the maximum allowable price," 10 C.F.R. § 212.81(a), where "maximum allowable price" was defined as

> [t]he weighted average price at which the product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973 computed in accordance with the provisions of § 212.83(a), plus increased product costs and increased non-product costs incurred between the month of measurement and the month of May 1973....

Id. § 212.82. The regulations were complex and comprehensive, setting forth the precise definitions, accounting methods,

---

1. The Cost of Living Council was the original agency for administering ESA. It was succeeded by the Federal Energy Administration, which was succeeded by the Department of Energy.

and subcalculations to be used under the general refiner price rule. The regulations were in effect from August 20, 1973 through January 28, 1981, and were periodically amended. A violation of any of these regulations potentially could result in an overcharge to the purchaser.

Any such overcharges were recoverable by the injured purchaser under § 210 of the ESA.[2] A person intentionally charged a price in excess of the maximum allowable price could sue to recover as much as three times the amount of the overcharge[3], ESA § 210(b). A person unintentionally overcharged "notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error" could sue to recover the amount of the actual overcharge, *id.*

A specific instance of conduct by the refiner which violates one or more pricing regulations and causes an overcharge creates an ESA cause of action, *Lerner v. Atlantic Richfield Co.,* 731 F.2d 898, 901 (Temp.Emer.Ct.App.1984).[4] *See also Go-Tane Service Stations, Inc. v. Clark Oil & Ref. Corp.,* 798 F.2d 481, 484 (Temp.Emer. Ct.App.1986) *cert. denied* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 704 (1986). "The statute of limitations begins to run when an act with decisive continuing effect causes intitial injury at a given time...." *Go-Tane,* 798 F.2d at 486; *see also CPI Crude, Inc. v. Coffman,* 776 F.2d 1546, 1552–53 (Temp.Emer.Ct.App.1985); *Oerther v. Pennzoil Co.,* 763 F.2d 420, 421 (Temp.Emer.Ct.App.1985). The specific violation is not "continuing" for purposes of tolling the statute of limitations, *Go-Tane,* 798 F.2d at 485; *CPI Crude,* 776 F.2d at 1552–53; *Oerther,* 763 F.2d at 421.

ARCO has moved to dismiss or for summary judgment on all of Sinclair's claims on statute of limitations grounds. ARCO asserts that Sinclair's treble damage claims have a one year statute. Sinclair responds that its claims have a four year limitations period, and that its lawsuit is timely because those statutory periods were tolled under either a fraudulent concealment theory or a class action theory, or both.

## TREBLE DAMAGE CIAIM LIMITATIONS PERIOD

Because the ESA and the EPAA do not contain a specific statute of limitations, we must apply the most closely analogous state statute, *CPI Crude, Inc. v. Coffman,* 776 F.2d 1546, 1550 (Temp.Emer.Ct.App. 1985).[5] Resolution of this issue is a pure question of law.

ARCO, relying primarily on *Ashland Oil Co. of California v. Union Oil Co. of California,* 567 F.2d 984 (Temp.Emer.Ct. App.1977), and *Martin Oil Service, Inc. v. Koch Refining Co.,* 718 F.Supp. 1334 (N.D. Ill.1989), asserts that Sinclair's treble damage action[6] is subject to Utah's one year

---

2. The ESA § 210 remedy is as follows:
  (b) In any action brought under subsection (a) against any person ... selling goods or services who is found to have overcharged the plaintiff, the court *may, in its discretion,* award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:
    (1) an amount not more than three times the amount of the overcharge upon which the action is based, or
    (2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge....
  12 U.S.C.A. § 1904 note (emphasis added).

3. "(c) For the purposes of this section, the term 'overcharge' means the amount by which the consideration for the ... sale of goods ... exceeds the applicable ceiling under regulations or orders issued under this title." 12 U.S.C. § 1904 note.

4. The Temporary Emergency Court of Appeals (TECA) is the court of appellate review for ESA cases.

5. When Congress does not provide a federal statutory limitations provision for a federal action, the forum state's statute of limitation for analogous state claims is applicable if it is not inconsistent with federal policy. *See Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1941–42, 85 L.Ed.2d 254 (1984).

6. ESA § 210 actions for actual overcharges and for treble overcharges are separately analyzed for statutes of limitation purposes. *See Ashland*

limitations period for "an action upon a statute for a penalty," Utah Code Ann. § 78–12–29(2). Sinclair, relying primarily on *Carbone v. Gulf Oil Corp.*, 812 F.2d 1416 (Temp.Emer.Ct.App.1987) and *U.S. Oil Co., Inc. v. Koch Ref. Co.*,[7] Civ. No. 79–C–659 (E.D.Wisc.), contends that the treble damage action is subject to Utah's four year limitations period for "an action for relief not otherwise provided for by law," Utah Code Ann. § 78–12–25(2).

### A. Background.

The TECA has addressed but not clearly resolved the question in point. In *Ashland Oil Co. of California v. Union Oil Co. of California* (1977) the TECA stated that the federal court selecting a state statute of limitations would "accept the state court interpretations of the state's limitations statute, but the nature of the claims presented will be determined by federal law...." 567 F.2d at 990 (citations omitted). Analyzing the nature of the claim, the court acknowledged § 210's dual purpose of providing "both remedy for and deterrence against the violation of pricing regulations," *id.*, but laid emphasis on its deterrent value, citing to portions of the Congressional Record.[8] The TECA pointed to the treble damage claim's requirement of "more stringent proof of additional elements than that warranting the award of merely compensatory relief," *id.*, and in a footnote stated that:

Section 210 draws a clear distinction between remedial recovery of overcharges and treble damages for intentional violations in the nature of a penalty beyond compensation; and for each claim there is specified a prerequisite not applicable to the other. *See Manning v. Univ. of Notre Dame Du Lac*, 484 F.2d 501 (TECA 1973).

567 F.2d at 990 n. 12. After this brief analysis, the *Ashland* court characterized the federal nature of the action as one for a "penalty."[9]

The TECA then considered the applicability of a California statute of limitation for actions "upon a statute for a penalty or forfeiture," examining California court interpretations of "penalty" as used in their statutes of limitation. The TECA determined that under California law "actions for damages beyond or without reference to actual loss" were actions for a "penalty or forfeiture," *id.* at 991, and finding that the treble damages claim fit within this definition, *id.*, applied the penalty statute to bar the plaintiff's ESA claim.

Ten years later, in *Carbone v. Gulf Oil Corp.*, 812 F.2d 1416 (1987), the TECA analyzed the nature of the actual damage claim "in keeping with the policy underlying creation of the federal statutory action," *id.* at 1421. Based on legislative history, the court identified dual purposes of deterrence and compensation underlying § 210 actual damage claims, *id.* The court determined, however, that the basic nature

> *Oil Co. of Calif. v. Union Oil Co. of Calif.*, 567 F.2d 984, 993 (Temp.Emer.Ct.App.1977); *Carbone v. Gulf Oil Corp.*, 812 F.2d 1416, 1421 (Temp.Emer.Ct.App.1987).

**7.** The *U.S. Oil* court, on the basis of *Carbone*, reversed its earlier ruling that a state "penalty" statute of limitations applied to the plaintiff's treble damage claim. We do not find *Carbone* in and of itself strongly suggestive of a "compensatory" characterization for treble damage claims, *see* discussion *infra* at 898 n. 10.

**8.** The *Ashland* court quoted a section of the House Report that indicated § 210 "would serve not only to provide a means to recover losses, but would provide a strong deterrent to those who would willfully violate this Act." 567 F.2d at 990 n. 11 (quoting H.R.Rep. No. 92–714, 92d Cong., 1st Sess. (1971)). The court also quoted

from a Senate Report that indicated that the § 210 treble damage claim "provides a traditional method by which violators of regulations may be discovered and other would-be violators may be deterred." *Id.* (quoting Senate Rep. No. 92–507, 92d Cong., 1st Sess. (1971)); U.S.Code Cong. & Admin.News 1971, p. 2283.

**9.** It disturbs us that the *Ashland* court characterized the claim as a federal "penalty" without discussing the historical federal usage of that word, which is in fact quite narrow. *See* discussion *infra* at 899–900. Further, although the *Ashland* court cited *Manning* in support of the "clear distinction" between the "remedial recovery of overcharges and treble damages for intentional violations in the nature of a penalty beyond compensation," the *Manning* court never used the word "penalty" except in quoting § 208 of the ESA, *Manning*, 484 F.2d at 504 n. 1.

of the actual damage claim was compensatory, stating:

> The authority to award treble damages, if in the action for damages under Section 210 the overcharge is willful, does not change the compensatory nature of the basic federal statutory action for the single amount of the overcharge under Section 210 to an action for a civil penalty....

812 F.2d at 1421 (emphasis added).

The TECA refused to rule on the nature of the treble damage claim and remanded that issue with a directive to the lower court to determine the issue in light of the federal policies discussed in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1984), and the antitrust cases cited by the *Wilson* Court in footnote 19.[10] Although *Carbone* did not expressly overrule *Ashland,* it clearly indicated the TECA's discomfort with the earlier ruling. We now examine the *Wilson* decision and the antitrust cases cited therein.

In *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1984), the United States Supreme Court characterized actions under 42 U.S.C. § 1983 for the purpose of borrowing an appropriate state statute of limitations. Such characterizations are to be "derived from the elements of the cause of action, and Congress' purpose in providing it," *id.* at 269, 105 S.Ct. at 1943, and are "ultimately a question of federal law," *id.* at 270, 105 S.Ct. at 1944.[11]

Expounding on this "federal law" approach, the *Wilson* Court approvingly cited "better reasoned authority" which had treated statute of limitation questions in the antitrust treble damage area "as a matter of federal law":

> The problem we address today often arose in treble-damages litigation under the anti-trust laws before Congress enacted a federal statute of limitations.... The question whether antitrust claims were more analogous to penal claims or to claims arising in tort, contract, or on a statute, was treated as a matter of federal law by the better reasoned authority. See *e.g. Moviecolor Limited v. Eastman Kodak Co.,* 288 F.2d 80, 83 (CA2) cert. denied, 368 U.S. 821 [82 S.Ct. 39, 7 L.Ed.2d 26] (1961); *Fulton v. Loew's, Inc.* 114 F.Supp. 676, 678–682 (Kan.1953); *Electric Theater Co. v. Twentieth Century-Fox Film Corp.,* 113 F.Supp. 937, 941–942, (WD Mo.1953); *Wolf Sales Co. v. Rudolph Wurlitzer Co.,* 105 F.Supp. 506, 509 (Colo.1952).

*Wilson,* 471 U.S. at 269 n. 19, 105 S.Ct. at 1943 n. 19.

It was in reaction to this footnote that the TECA in *Carbone* expressed concern about the *Ashland* decision and directed trial courts to examine the *Wilson* decision. We now examine in some detail the "better reasoned" antitrust cases cited by the *Wilson* Court to see what "treatment as a matter of federal law" entailed in this highly analogous area of law and to better understand the *Wilson* Court's approach to the limitations question.

*The Antitrust "Better Reasoned" Cases.*

These antitrust cases support a two-step choice of limitations analysis: first, the court looks to federal law to determine the nature of the claim; second, the court selects from the state limitations statute the period "accorded an action of a same or

---

**10.** Sinclair argues that *Carbone* effectively overrules *Ashland* and requires us to hold that Utah Code Ann. § 78–12–29(2) is not applicable to Sinclair's treble damage claim. We read the *Carbone* language to merely reaffirm that the actual damage claim and the treble damage claim are to be separately considered. The *Carbone* court pointedly decided not to rule on the nature of the treble damage claim. We see no reason to read into the *Carbone* court's comments more than is there or to speculate about what the *Carbone* court would have decided had it ruled on the issue.

**11.** The Court also decided that § 1983 claims should not be characterized separately for each case on a fact-specific basis. Emphasizing that § 1983 provides "a uniquely federal remedy," 471 U.S. at 271, 105 S.Ct. at 1944, which could have "no precise counterpart in state law," *id.* at 272, 105 S.Ct. at 1945, the Court held that one broad characterization of all § 1983 claims as actions for injuries to personal rights best served Congress' purposes, *id.*

similar nature which arises under the law of the forum." *Wolf Sales Co. v. Rudolph Wurlitzer Co.,* 105 F.Supp. 506, 508 (D.Colo.1952); *see Electric Theater Co. v. Twentieth Century–Fox Film Corp.,* 113 F.Supp. 937, 941 (W.D.Mo.1953); *Fulton v. Loew's, Inc.,* 114 F.Supp. 676, 682 (D.Kan. 1953); *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 83 (2d Cir.1961). These cases did not spend much time independently analyzing the nature of the federal antitrust claim, as that question had been well-addressed and resolved through *Huntington v. Attrill,* 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123 (1892), and its progeny. The courts cited the *Huntington* line of cases, and held that the federal nature of the antitrust claim was compensatory. More effort was expended, however, on determining whether state limitations statutes for "penalty" actions could nonetheless apply to the "compensatory" federal claim if state actions for enhanced damages fell under those "penalty" statutes. Further exploration of both of these analytical steps is helpful.

We find the analysis of the nature of the federal claim contained in the *Huntington* line of cases particularly helpful and relevant to the case at bar. In *Huntington v. Attrill,* the Supreme Court fully discussed the meaning of "penal" in the context of the international rule against execution of another country's penal laws. The Court cautioned against "the danger of being misled by the different shades of meaning allowed to the word 'penal' in our language," [12] 146 U.S. at 667, 13 S.Ct. at 227, and determined that "penal" was properly defined strictly:

> Penal laws, strictly and properly, are those imposing punishment for an offense committed against the state, and which, by the English and American constitutions, the executive of the state has

the power to pardon. Statutes giving a private right of action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal.

*Id.* The Court stated that the test for a "penal law" was "whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual," 146 U.S. at 668, 13 S.Ct. at 228, and approvingly cited cases in which the courts held that statutes giving accumulative damages to the injured party for his own use were not "penal actions." *Id.* These cited cases acknowledged that enhanced amounts gave a "penalty" but because it was given "to the party grieved" for "his own use" the cases held the actions to be remedial rather than penal.

In *Brady v. Daly,* 175 U.S. 148, 20 S.Ct. 62, 44 L.Ed. 109 (1899) the Supreme Court applied the *Huntington* analysis to the antitrust treble damage claim and characterized the claim as non-penal. The *Brady* Court stated:

> Where the statute provides in terms, as the one before us does, for a recovery of damages for an act which violates the rights of the plaintiff and gives the right of action solely to him, the fact that it also provides that such damages shall not be less than a certain sum, and may be more, if proved, does not, as we think, transform it into a penal statute.

175 U.S. at 156, 20 S.Ct. at 65. *See also Chattanooga F. & P. Works v. Atlanta,* 203 U.S. 390, 397, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906) ("The construction of the phrase 'suit for a penalty,' and the reasons for that construction, have been stated so fully by this court that it is not necessary to repeat them."); *Sullivan v. Associated*

---

12. The Court stated:

In the municipal law of England and America, the words "penal" and "penalty" have been used in various senses. Strictly and primarily, they denote punishment, whether corporal or pecuniary, imposed and enforced by the state for a crime or offense against its laws.... But they are also commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered. They are so elastic in meaning as even to be familiarly applied to cases of private contracts, wholly independent of statutes, as when we speak of the "penal sum" or "penalty" of a bond.

146 U.S. at 667, 13 S.Ct. at 227.

*Billposters and Distributors,* 6 F.2d 1000, 1009 (2d Cir.1925) ("A statute may be penal in one part and remedial in another. If a statute which is penal in part gives a remedy for an injury to the person injured to the extent that it gives such remedy it is a remedial statute, irrespective of whether it limits the recovery to the amount of actual loss sustained or as cumulative damages as compensation for the injury.... But in so far as the statute authorizes a *third person,* not the loser, to recover treble damages or the money lost, the statute is penal...." (citations omitted) (emphasis added)); *Baush Mach. Tool Co. v. Aluminum Co. of Amer.,* 63 F.2d 778, 780 (2d Cir.1933) (citations omitted) ("An action for damages under the Anti-trust Laws is not one for a penalty. The suit is between private parties, and the enlargement of the damages does not convert it into a prosecution for a penalty."). The *Brady* Court also recognized the "punishment" aspect of the anti-trust treble damages, but stated, "Although punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrongdoer is concerned, yet we think it clear such is not its chief purpose, which is the award of damages to the party who had sustained them...." 175 U.S. at 156, 20 S.Ct. at 65.

As seen above, to whom the cause of action is given is fundamental to the federal "penalty" characterization. If an aggrieved individual can sue for actual injuries he sustained, the action, regardless of enhanced "punitive-type" damage provisions, is remedial. Thus, for federal characterization purposes, even if the action is in part intended to deter or punish, the basic compensatory nature of the action is not changed.

We now turn to the second aspect of the limitations analysis, the selection of the state limitations period which applies to actions "of a same or similar nature which arise under the law of the forum." Unfortunately, on this point the cases cited by the Supreme Court reveal two contrasting approaches. The courts in three of the four cases cited, *Wolf Sales Co. v. Rudolph Wurlitzer Co.,* 105 F.Supp. 506 (D.Colo.1952), *Electric Theater Co. v. Twentieth Century–Fox F. Corp.,* 113 F.Supp. 937 (W.D.Mo.1953), and *Fulton v. Loew's, Inc.,* 114 F.Supp. 676 (D.Kan.1953), followed a somewhat simple "labelling" approach: if the federal nature is non-penal, a state statute of limitations for "penalty" actions cannot apply. This approach evidences a concern that an exploration into the substance of the state claims covered by the limitation statute in order to determine whether they were in fact "of a similar nature" would result in a "state" rather than "federal" characterization of the federal claim. The rationale is most clearly stated by the *Electric Theater* court:

> It is true that a federal court will, particularly in diversity cases, apply state court construction to a state-derived cause of action. But when state court construction, even of its own statutes, invades the province of characterization in a field divorced from state regulation, then clearly such an invasion of the federal judicial province is entitled to no consideration. The line of demarcation between statutory construction and characterization is often elusive and distressingly vague. Yet, we cannot ignore the distinction. Although by federal law we are directed to the state statute of limitations in cases of this kind, we do not think that such procedural directive transforms state adjective law into a springboard from which state courts can assert a formative influence on federal substantive law. Regardless of defendants' protestations to the contrary, to allow an anti-trust action to be characterized as one for a penalty or forfeiture, depending on state court *stare decisis,* would involve considerably more than "statutory construction" for a limited procedural purpose.

113 F.Supp. at 941.[13] *See also Wolf,* 105 F.Supp. at 509; *Fulton,* 114 F.Supp. at 682

---

**13.** Such a "state" approach was adopted by the district court of New Jersey in *Florida Wholesale Drug, Inc. v. Ronson Art Metal Works, Inc.,* 110 F.Supp. 573, 577 (1953), distinguished by the *Electric Theater* court as supporting "a philosophy we cannot follow." 113 F.Supp. at 942.

("The cases taking the 'federal' approach seem to apply the state statute of limitations to the cause of action given under the Sherman Act as if the construction of that Act by the Supreme Court were a part of it.")

In contrast to these three cases, the court in the other case cited by the *Wilson* Court, *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80 (2d Cir.1961), took a more complicated "substance" approach: if the federal nature was non-penal, the state "penalty" statute still was examined to see if state law applied it to state actions which the state called "penal" but were really similar in substance to the federal "non-penal" action.[14] In the court's words:

In dealing with federally created claims both federal and state law must sometimes be consulted to determine whether the borrowed period has run. Thus, when a state has established different periods of limitation for different types of action, a federal court enforcing a federally created claim looks first to federal law to determine the nature of the claim *and then to state court interpretations of the statutory catalogue to see where the claim fits into the state scheme.*

288 F.2d at 83 (emphasis added).

Although the meaning of the underlined language is not clear from this brief statement, the *Moviecolor* court cites to *Bertha Bldg. Corp. v. National Theatres Corp.*, 269 F.2d 785, 788–89 (2d Cir.1959), another anti-trust case, which makes the *Moviecolor* court's intended role of state court interpretation evident. The *Bertha* court stated:

Whether the three year or six year statute is to be applied by the federal court, the latter must accept the statutes as construed and interpreted by the New York courts. It is for them to determine what is meant by the word "penalty" in the three year statute. But the purposes attributable to the federal anti-trust laws must be governed by federal law....

Considered in the light of these principles, the Supreme Court's decision in *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390 [27 S.Ct. 65, 51 L.Ed. 241 (1906)] ... is not decisive of this case. There the Supreme Court held that an action for treble damages under the anti-trust laws was not an action for a penalty within the meaning of the federal statute of limitations for penal suits. But the word "penalty" in a federal statute has a different meaning than the same word in the New York statute.

269 F.2d at 788 (footnote omitted).[15]

Obviously, the state court determination permitted under this approach is at odds with the approach taken in *Wolf, Electric Theater*, and *Fulton*. We see no logical way to reconcile the cases. Fortunately, we do not have to select the intended approach because the outcome in this case is the same under either.[16] We turn now to the case at bar.

---

The *Electric Theater* court stated that the New Jersey court believed "the nature of a federal anti-trust action is to be determined by the Supreme Court of the State whose statute of limitations is applicable." *Id.* We note that in fact, the New Jersey district court recognized that the character of the suit was not one for a penalty under federal law, 110 F.Supp. at 575, but believed that if "the view of the state courts as to a penalty, differs radically from the view of the federal courts in that regard, ... a state penalty limitation statute can be found applicable to this Federal nonpenal proceeding." *Id.* This appears to be precisely the view of the *Moviecolor* court, *infra* at 901.

**14.** For example, if state actions for enhanced damages were considered "penalty" actions by the state, the "non-penal" ESA treble damage action would still fall under the state "penalty" statute.

**15.** After making these remarks, the *Bertha* court held that the New York state court did "not regard actions for civil damages which are made exemplary in part only, as falling within [the New York penalty limitations statute]. A suit for treble damages under the anti-trust laws is plainly of this character." 269 F.2d at 789.

**16.** If we had to choose, however, our choice would be the *Wolf et al* approach. Those cases clearly indicate the approach taken, while the *Moviecolor* discussion is somewhat vague and requires us to look to *Bertha Building* for a complete understanding. Therefore, we believe the Court's inclusion of *Moviecolor* was inadvertent.

B. *Limitations Analysis.*

1. The Federal Nature of § 210 Treble Damage Claims.

It is clear that the first step in the limitations analysis is to determine the nature of the § 210 treble damage claim as a matter of federal law. We believe the "penalty" analysis in the *Huntington* line of cases is applicable here. The antitrust cases are closely analogous to the ESA claim at bar and clearly establish the proper meaning of "penal" or "penalty" in the federal context. If we are to determine whether the ESA claim can be called a federal "penalty statute" this line of cases cannot be ignored.

The focus of the federal penalty analysis is primarily on to whom the cause of action is given. The ESA § 210 treble damage action is a private cause of action by the individual who suffered actual injury due to overcharges. Although it is clear that Congress provided enhanced damages in part to deter violations, *Ashland,* 567 F.2d at 990, the enhanced amount does not change the basic remedial purpose of the underlying action to recover the overcharges suffered. We believe the federal nature of the action is non-penal.[17]

The existence of both an "actual damage" claim and a "treble damage" claim under § 210 supports the compensatory result. These separate claims are more accurately described as an action for an unintentional violation made by bona fide mistake, and an action for an intentional violation. The claims have different elements of proof, and allow different recoveries. If an unintentional violation resulting from bona fide mistake occurs, the injured party may sue for his actual damages. If the violation is intentional, the injured party may sue for damages and recover the actual overcharge plus up to twice that amount. In either situation, there must first be an injury to the party suing. Thus, each separate claim falls squarely within the federal "penalty" analysis.

Any "punishment" that results from the treble damage award does not so heavily outweigh the compensatory purpose that a non-penal characterization is rendered implausible. The statutory section does not compel the court to award three times the damages if an intentional violation is found.[18] Instead, the court "may" award "an amount *not more than* three times the amount of the overcharge," § 210(b)(1). Accordingly, in its exercise of discretion and having considered all of the equities of the case, there is no guarantee that the court would find warranted a damage award greatly in excess of the actual overcharges. In fact, the enhanced amount could be relatively minimal. In such a situation, the "compensatory" purpose would far outweigh the "penal" one, causing us to doubt that a once-and-for-all "penal" characterization of the nature of the treble damage claim would be appropriate. Indeed, a "compensatory" label is far more appropriate for all circumstances as it is certain that the compensatory purpose will always be served.[19]

---

**17.** We do not find any merit in the suggestion that we "split" the treble damage cause of action for limitations purposes and treat differently the actual overcharge and enhanced damage portions of the treble damage claim. Congress did not split the remedy for an intentional violation into one cause of action purely for compensation and one cause of action purely for punishment. We are not aware of any legal principle which would allow us judicially to do so.

**18.** The pertinent provision reads:
[T]he court *may, in its discretion, award* the plaintiff reasonable attorney's fees and costs, *plus* whichever of the following sums is greater:
  (1) an amount not more than three times the amount of the overcharge upon which the action is based, or

  (2) not less than $100 or more than $1000....
ESA § 210(b)(1). The grammar in this section is confusing. It is arguable that the phrase "in its discretion" does not modify more than the attorney fee/cost award phrase. However, the words "may ... award" must be read to modify both the attorney fee/cost award and the damage provisions, given the lack of any other verb in the sentence. The use of "may" implies discretion. So too does the phrase "an amount *not more than* three times the ... overcharge," as contrasted with, for example, the phrase "an amount equal to three times the overcharge."

**19.** Even when the damages are largely enhanced for purposes of punishment, we do not believe that a "penalty" label is appropriate. We find such a situation far more analogous to a puni-

Finally, the argument that Congress intended a penalty in this section is undermined by § 208 of the ESA, entitled "Sanctions; criminal fine and civil penalty." In that section Congress expressly used a "penalty" label and statutorily set the amount of punishment, giving no discretion to the court. 12 U.S.C.A. § 1904 note.

Our approach to characterization of the claim was not taken by either of the parties in this case, nor by the TECA in *Ashland.* We believe, however, that after *Carbone,* this approach is correct. Other district courts ruling on the issue after *Carbone* have not approached the issue as we have.[20] Therefore, we now briefly discuss the post-*Carbone* district court case upon which ARCO has primarily relied for its argument that the treble damage claim is one for a penalty, *Martin Oil Service, Inc. v. Koch Refining Co.,* 718 F.Supp. 1334 (N.D.Ill.1989), and respectfully voice our disagreement with it.

The *Martin Oil* court determined that "punitive damage claims brought pursuant to § 210 ... are more analogous to a penalty than are antitrust treble damages," and applied the two year Illinois statute of limitations for penalties. *Id.* 718 F.Supp. at 1363–64. The court portrayed the ESA as being more punitive than the antitrust action because: (1) the ESA treble damages are only available if the violation was intentional,[21] while antitrust treble damages are compulsory regardless of mental state, *id.* at 1362; (2) the court is given discretion in the amount of the damages, presumably thus being better able to match the "punishment" with the evilness of the violation, *id.* at 1363; and (3) the antitrust damages

are required to fully compensate the antitrust plaintiff because proving actual damages resulting from price-fixing is extremely difficult, *id.* at 1363. In making these distinctions, the court clearly believed the "punishment" rendered through the ESA treble damage claim was a sufficient basis for calling the claim a "penalty" action.

We believe the *Martin Oil* court's analysis is flawed, primarily due to the court's failure to recognize and deal with the *Huntington* line of cases. As a result, the *Martin Oil* court attempts to distinguish the ESA claim from the antitrust claim on points that played no role in the characterization of the antitrust claims as "non-penal." The antitrust claim characterization was solidly based on the historical federal definition of "penalty," the critical factor being to whom the cause of action was given. Therefore, to the extent that the *Martin Oil* court's distinctions between the ESA and anti-trust claims are valid, they are distinctions that do not affect the characterization.

We also are unconvinced that these distinctions significantly separate the antitrust action from the ESA claim. For instance, the *Martin Oil* court asserts that the antitrust treble award,[22] unlike the ESA treble award, "compensates" for the difficulty of proving actual damages. We have found no suggestion of this intended purpose in the antitrust cases. Instead, the antitrust cases make clear that the enhanced award was primarily intended as an enforcement tool to stimulate "private initiative and diligence," *see e.g. Mechanical Contractors Bid Depository v. Christiansen,* 352 F.2d 817, 821 (10th Cir.1965),

tive damage award than to a penalty. *See infra* at 904–05.

**20.** Sinclair cites *U.S. Oil Co., Inc. v. Koch Ref. Co.,* Civ. No. 79–C–659 (E.D.Wisc.) in support of its argument that the claim is non-penal. We find little helpful analysis in that case however, which primarily relied on inferences it drew from the *Carbone* language.

**21.** The Martin court suggests that § 210 damages require proof of wilfulness. This is incorrect. § 210 awards treble damages *unless* the *defendant* can show that the overcharge was *not*

*intentional* and resulted from a bona fide error notwithstanding the maintenance of procedures designed to avoid such errors. "Intentional" is a different mental state than "wilful." Also, it is proof of the absence of intent by the defendant, not proof of wilfulness by the plaintiff, which is required.

**22.** A person injured by a violation of the antitrust laws may sue in district court "without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

and to deter violators and others from future illegal acts, *see e.g.* *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) ("[t]he purpose of giving private parties treble damage ... remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws"). Further, to the extent a difficulty of proof exists, courts have recognized it and have dealt with it by imposing a somewhat lenient standard of proof for damages actually suffered, *see e.g.* *Zenith v. Hazeltine*, 395 U.S. at 123–24, 89 S.Ct. at 1576–77 (1969); *E.J. Delaney Corp. v. Bonne Bell, Inc.*, 525 F.2d 296, 303 (10th Cir.1975); *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1146 (8th Cir.1981); *City of Mishawaka, Inc. v. American Elec. Power Co., Inc.*, 616 F.2d 976, 987 (7th Cir.1980) *cert. denied* 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). We doubt the courts would have made this accommodation if Congress intended the treble damage provision to rectify a difficulty of proof.

We also note that the antitrust action allows proof of "damages" in the ordinary sense—a plaintiff can recover for any damages which he can show were caused by the price-fixing—while the ESA action limits the remedy to the difference between what the purchaser was charged and what he legally should have been charged. The ESA remedy forecloses the recovery of any other provable damages which may have resulted from the overcharge. Thus, the antitrust *actual* damages may compensate more fairly than the ESA *actual* damages

do. This weakens the argument that an enhanced damage amount is more necessary to compensate the antitrust plaintiff than the ESA plaintiff.[23]

We also question the *Martin Oil* court's theory that ESA § 210 is more like a "penalty" than the antitrust action because ESA limits treble damages to intentional behavior, reflecting a decision to "punish" only "bad" violators, while the antitrust remedy broadly applies treble damages to all antitrust violations, presumably removing a "punishment" motive. "Penalties" are indeed fashioned to "punish" individuals for committing socially undesirable acts. They do not, however, by definition require an "evil" state of mind. Many penal statutes impose strict liability if the determination is made that the act itself is unacceptable. Therefore, it could be argued that the antitrust treble damages were also intended to punish,[24] perhaps because Congress believed the societal effects flowing from restraint of trade are serious enough to warrant punishment of those who conduct business oblivious to the anticompetitive effect of their actions.

Finally, even if one views the ESA treble damage action as linked to "bad" behavior, we believe its joint remedial and "punitive" aspects make it more similar to a "compensatory" action in which punitive damages are available, than to a "penalty" action. The ESA action for intentional violation is only given to injured individuals, who will recover their actual damages and an additional amount up to treble the overcharge should the court in its discretion[25] determine that the circumstances warrant it. These circumstances will include the nature

---

**23.** In addition, some of the damages actually suffered by an ESA plaintiff, such as loss of profits due to a decrease in consumer demand caused by the illegally high price, may be as difficult to prove as the correct price in the absence of price-fixing. Under the *Martin Oil* court's rationale, one could argue that the ESA treble damage award was created to handle this difficulty of proof, thus removing any meaningful distinction.

**24.** This possibility was recognized by the *Brady* Court: "Although punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrongdoer is

concerned, yet we think it clear such is not its chief purpose, which is the award of damages to the party who had sustained them...." 175 U.S. at 156, 20 S.Ct. at 65.

**25.** The *Martin Oil* court has also pointed to the presence of court discretion as supportive of a "penalty." We agree that discretion does enable a court to better "fit the punishment" to the "wrong" but note that judicial discretion is involved in many "equitable" determinations. The simple presence of discretion in an admittedly "punitive" aspect of an otherwise "compensatory" action does not change the entire nature of the action to "penal."

of the defendant's behavior. Similarly, punitive damages are available in some compensatory actions when the defendant's actions causing actual damage were sufficiently egregious. It is well established that punitive damages are not an independent cause of action, but a remedy.[26] Accordingly, there are not statutes of limitation separately applicable to causes of action because the plaintiffs have requested punitive damages, or to the punitive damage amounts themselves. The punitive damage remedy expires with the underlying cause of action, no sooner and no later.

We respectfully disagree with the *Martin Oil* decision. We believe that the historical federal "penalty" analysis is material to determining the federal nature of ESA § 210, and that under that analysis the nature of the treble damage claim is "remedial" or "compensatory" rather than "penal" as a matter of federal law.

2. Selection of the State Statute.

Because the approach intended by the *Wilson* Court is unclear, we analyze the selection issue in two ways.

First, under the approach of the *Wolf, Electric Theater*, and *Fulton* antitrust cases cited by the *Wilson* Court, our determination that the ESA claim is not penal forecloses application of the Utah one year limitation period for "an action upon a statute for a penalty," Utah Code Ann. 78–12–29(2) (1953). There being no specific tort statute more closely analogous to the claim, Utah's four year statute of limitations for "an action for relief not otherwise provided for by law," Utah Code Ann. § 78–12–25(2) (1953), is the applicable statute.

Under the second approach, supported by the *Moviecolor* case, our "non-penal" determination does not automatically foreclose application of Utah's "penalty" statute, Utah Code Ann. 78–12–29(2). Instead, we must determine how Utah law defines "an action upon a statute for a penalty" and

then see whether that definition includes otherwise remedial or compensatory actions which allow enhanced damages.

Sinclair has cited us to *Christensen v. Paramount Pictures*, 95 F.Supp. 446 (D.Utah 1951), in support of its position that § 210 treble damage claims are not "penal" under Utah law. There, the Utah federal district court was determining whether Utah Code Annotated § 104–2–26(2) (1943), which provided a one year limitations period for "an action upon a statute for a penalty or forfeiture where the action is given to an individual, or to an individual and the state," applied to treble damage claims under the Sherman and Clayton Antitrust Acts. In ruling that it did not, the court stated,

> The word "penalty" covers a whole range of meanings. At one extreme it may mean a punishment imposed upon an offender against the criminal laws. At the other, it may mean simply the means by which a private right is made secure. *It is the judgment of this court that the Utah statute uses the word in the former sense* and that the treble damage sanction in the anti-trust laws was intended primarily to protect private rights.

*Id.* at 449–50 (emphasis added).

The limitations provision at issue in this case is a successor to the 1943 provision. Passed in 1951 and still in effect, the language of Utah Code Annotated § 78–12–29(2) is identical to the 1943 provision. Like the 1943 law, the 1951 version applies to "an action upon a statute for a penalty or forfeiture where the action is given to the individual, or to an individual and the state."[27]

Given the lack of Utah case law defining "an action upon a statute for a penalty," we see no reason to depart from the analysis or conclusion of the *Christensen* court. We hold that the Utah "penalty" statute, Utah Code Ann. § 78–12–29(2), was not in-

---

**26.** *See* 22 Am.Jur.2d § 741.

**27.** We do not believe that § 78–12–29(3), which specifically identifies actions "upon a statute, or upon an undertaking in a criminal action, for a

penalty or forfeiture," in any way affects this court's earlier interpretation of the language now found in § 78–12–29(2).

tended to apply to remedial actions which allow enhanced damages to the injured individual. Accordingly, § 78–12–29(2) is not applicable to plaintiff's ESA § 210 treble damage claim.

As a result, the outcome in this case is the same under both the *Moviecolor* approach and the *Wolf, Electric Theater,* and *Fulton* approach. Because there is no other specific tort statute more closely analogous to the ESA claim, Utah's four year statute of limitations for "an action for relief not otherwise provided for by law," Utah Code Ann. § 78–12–25(2) (1953), is the applicable statute. This statute expired at the latest on January 28, 1981, unless the statue was tolled under either the fraudulent concealment or class action tolling doctrine.

## TOLLING THEORIES

### I. *Standard of Review.*

Although the parties have moved to dismiss or for summary judgment, they have submitted helpful materials beyond the pleadings on both the fraudulent concealment and class action tolling doctrine issues. Therefore, the court will consider the motion regarding these issues as one for summary judgment. Rule 12(b), Fed.R. Civ.P.

The standard for this court to rule on summary judgment motions is set forth in Rule 56(c), Fed.R.Civ.P. Summary judgment shall be granted when the material facts are undisputed and judgment in favor of the movant is appropriate as a matter of law. The movant can show the absence of a factual dispute by demonstrating that in the "pleadings, depositions, answers to interrogatories, admissions on file, and affidavits ... there is [no] evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the movant has carried this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.[28] The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

To be considered, the evidence must be admissible under the evidentiary standard that would be applied at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. at 2505, 2512, 91 L.Ed.2d 202 (1986). In considering a summary judgment motion, however, this court does not weigh the evidence but instead inquires whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510.[29] To determine if sufficient evidence exists "the inferences to be drawn from the underlying facts [in the admissible record] ... must be viewed in the light most favorable to the [nonmoving] party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). Finally, any admissible facts asserted by the party opposing the motion that are not controverted must be regarded as true.

### II. *Fraudulent Concealment Tolling Doctrine.*

▮▮▮▮ In their memoranda, the parties appear to agree that a party asserting the fraudulent concealment doctrine in the Tenth Circuit[30] must show

(1) the use of fraudulent means by the party who raises the ban of the statute;

---

**28.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

**29.** "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insuffi-

cient. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

**30.** Sinclair's statement that TECA has appellate jurisdiction over this case is only partially correct. Although TECA precedent controls the merits of the ESA claim, Tenth Circuit prece-

(2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action.

*King & King Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1154 (10th Cir.1981) (quoting trial court in *King & King,* 446 F.Supp. 906, 911 (E.D.Okl.1978)). The parties do not agree that summary disposition of a statute of limitation question is appropriate where fraudulent concealment is allegedly involved.

The fraudulent concealment issue is treated like any other on a motion for summary judgment. If the undisputed facts show that judgment is appropriate as a matter of law, the motion will be granted. Similar to a negligence issue, however, the objective reasonableness test embodied in the due diligence element of fraudulent concealment raises some concern. The court is not the fact-finder on a motion for summary judgment and must be cautious not to assume that role. Only if reasonable minds could not differ on the present set of undisputed facts as to whether Sinclair "by the exercise of due diligence could not have known that [it] might have a cause of action," can the court rule on the third fraudulent concealment element as a matter of law.[31]

We now consider the evidence on each element of fraudulent concealment.

A. *The First Element: The Use of Fraudulent Means.* Sinclair asserts that

ARCO overcharged it and filed false Refiner's Monthly Cost Allocation Reports (RMCARs) with the DOE[32] to conceal the overcharges. In addition, ARCO allegedly "resisted efforts by purchasers to obtain access to the reports [under the Freedom of Information Act (FOIA)] which ARCO filed with the DOE," by arguing to the DOE that the documents fell within certain confidentiality exceptions. Finally, Sinclair asserts that ARCO has consistently required that any cost, price, and compliance information produced in connection with litigation be placed under seal and not be revealed to other purchasers.

For purposes of this motion ARCO concedes that this first element has been met.[33] ARCO asserts, however, that even if it did "conceal" the overcharges, Sinclair cannot establish the second and third elements.

B. *The Second Element: Successful Concealment from the Injured Party.* Sinclair asserts that ARCO's concealment was successful because Sinclair did not know of its cause of action against ARCO before it received the class action notice in *Van Vranken.*[34] Sinclair summarily states that ARCO may "claim that it was unsuccessful in concealing the violation of the pricing regulations ... [h]owever, it cannot obtain summary judgment on that matter." Sinclair Memo.Oppo. at 33–34.[35]

ARCO asserts that as a matter of law Sinclair cannot establish successful concealment. ARCO argues that its affirma-

dent controls federal non-ESA aspects, such as the statute of limitation question.

**31.** *See State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694 (10th Cir.1981) (court may summarily dispose of the case on statute of limitations grounds where "the documents before the court clearly and convincingly persuade the trial judge that plaintiff in the exercise of reasonable diligence would have discovered the [cause of action] at such a time as to bar the action")

**32.** Pursuant to 10 C.F.R. § 212.126(b), refiners were required to submit Refiner's Monthly Cost Allocation Forms (RMCARs) to the DOE. Allegedly false statements made by ARCO in these forms are part of the basis for Sinclair's fraudulent concealment claim.

**33.** Sinclair ambiguously has asserted in post-motion letters to this court that ARCO has conceded fraudulent concealment. Our review of the memoranda reveals only an admission for purposes of this motion that ARCO took the steps alleged by Sinclair to conceal overcharges. This amounts only to a concession of the first element, not of the entire fraudulent concealment doctrine.

**34.** *See* Affidavit of Peter Johnson at ¶ 5.

**35.** Elsewhere Sinclair asserts that "had ARCO correctly stated its costs, its violations would have been evident, the DOE would have readily discovered the overcharges and Sinclair could have been notified of its claim against ARCO." Memo.Oppo. at 29. This assertion is meritless as the DOE did discover the overcharges and

tive acts of concealment are not causally connected to Sinclair's failure to discover its cause of action, for three reasons. First, ARCO asserts that even if it filed false reports, the reports had "nothing whatever to do with the discoverability of Sinclair's cause of action" because "each and every one of the DOE enforcement allegations upon which Sinclair's complaint is based were publicly available and summarized in the *Federal Register* before May 1984." ARCO Rep.Memo. at 16. Second, ARCO asserts that

> because the false filings did not prevent DOE from issuing enforcement actions against ARCO during the period 1979–1983, it is crystal clear that the so-called false filings could not have frustrated even minimal efforts by Sinclair to discover its cause of action.

*Id.* at 17. Third, ARCO states that

> Sinclair completely undercuts its own claim of fraudulent concealment based on the alleged "false filings." ... Sinclair insists that it has *never seen* most of the information in the alleged false filings. [Therefore,] Sinclair could not possibly have been affirmatively misled by false filings which it says it never saw."

*Id.* at 18.

As ARCO has recognized, there is a causation requirement in this element of the fraudulent concealment doctrine.[36] The defendant must act to hide the cause of action and the plaintiff must not find it *because* it was hidden.[37] Only in such a causal circumstance does the equitable fraudulent concealment tolling principle make sense. Statutes of limitation are passed by legislatures to bar stale claims. They provide plaintiffs with what the legislature determines to be adequate time to discover, investigate, and bring causes of action. They enable defendants to intelligently plan future conduct free from the risk of financial liability or heightened legal expenses for long-past conduct. Once the legislature has determined what statutory timeframe strikes a balance between plaintiffs and defendants, courts should not lengthen it unless equity so requires.[38] Therefore, in order for "successful concealment" to be present there must be a causal connection between ARCO's "concealment acts" of false filings, interference with FOIA requests, and protective orders, and Sinclair's lack of knowledge about its cause of action for overcharges.

ARCO's first two arguments on this element, that its false reports were not successfully concealed from Sinclair because the DOE allegations were publicly available before May 1984, and that the DOE saw through the false filings and therefore

---

there is no evidence of record that the DOE typically notified affected purchasers other than through the DOE enforcement documents and publication in the Federal Register.

**36.** Lack of knowledge is covered in the third element; fraudulent acts are covered in the first. Therefore, to avoid redundancy, the second element must require something different. The causal link is implied in *State of Ohio v. Peterson, et al,* 651 F.2d 687, 694 (10th Cir.1981) ("where, as here, the concealment is insufficient to fool a reasonably diligent plaintiff but nevertheless allegedly prevented discovery by [the plaintiff] ..."); *State of Colo. v. Western Paving Const. Co.,* 630 F.Supp. 206, 208 (D.Colo.1986) (equitable tolling appropriate "where the ignorance of the fraud has been produced by affirmative acts of the guilty party in *concealing* the facts from the other...." (quoting *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874))).

**37.** Allegorically, the defendant must "pull the wool" over the plaintiff's eyes, and the plaintiff must fail to see because of the wool. Whether the plaintiff was not a good looker and did not find the cause of action because of his own negligence is dealt with under the due diligence element.

**38.** Clearly equity may require tolling of the statute: "The principle is that where one party has by his representations or his conduct induced the other party ... to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." *Glus v. Brooklyn Eastern Dist. Terminal,* 359 U.S. 231, 234, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959).

If without the defendant's affirmative actions to conceal the plaintiff would have timely discovered the cause of action, the defendant has upset the legislative balance. The defendant's "bad" concealing acts, if undiscovered and inoperative on the plaintiff, do not upset anything. It is only when they operate to another's disadvantage that they tip the scale.

the reports could not have fooled Sinclair, are misdirected. Both arguments are properly arguments going to the third element of whether a duly diligent party could have discovered the cause of action. The second element is only a cause in fact test. All that is required to meet it is that ARCO's concealment in fact fooled Sinclair. Whether it should have fooled Sinclair or whether Sinclair should have discovered the cause of action despite the concealment, is covered under the third element. ARCO's third argument, however, raises the proper concern—a lack of causation.

We have made an exhaustive review of the evidentiary record, mindful of the burden on the movant, ARCO, and of drawing reasonable inferences in Sinclair's favor. Having done so, we find the required causal element lacking. The proof of record on this issue is as follows.

In its second amended complaint, after Sinclair alleges the fraudulent actions to conceal taken by ARCO,[39] Sinclair makes the following relevant allegations:

29. As a result of ARCO's pattern of fraudulent concealment, Sinclair has been prevented and precluded from learning of ARCO's violations of the DOE Regulations. In fact, as a result of ARCO's pattern of fraudulent concealment, Sinclair did not learn of ARCO's violation of the DOE Regulations and of the overcharges which ARCO had imposed on Sinclair until July 14, 1987....

30. At all times prior to July 14, 1987, Sinclair exercised due diligence in attempting to discover the facts with respect to its overcharge claim against ARCO. ARCO's fraudulent concealment, however, prevented Sinclair from

doing so. Furthermore, as a result of ARCO's pattern of fraudulent concealment, Sinclair could not, in the exercise of reasonable diligence, have discovered those operative facts involved in its cause of action.

Second Amend.Comp. at 17–18. As can be seen, Sinclair has vaguely alleged causation: that ARCO's actions "prevented and precluded" Sinclair from learning of its cause of action. Glaringly absent from these allegations is any assertion that Sinclair looked at the RMCARs and was misled by them to believe that it had not been overcharged. Nor is there any allegation that Sinclair attempted to get and was precluded by ARCO's interference or objection from getting the RMCARs or any other DOE enforcement documents from the DOE. Also lacking is any allegation that Sinclair was timely aware of other lawsuits and attempted to get but was precluded by ARCO's protective order from getting RMCARs and other DOE documents of record. As a result, we do not believe that Sinclair has alleged facts sufficient to establish a prima facie case on the second element.

A more compelling reason to grant summary judgment, however, is that ARCO has shown facts sufficient to negate the causation element and Sinclair has failed to meet its burden to go beyond its pleadings and show an actual dispute of fact on the issue. Sinclair has asserted that false filings, interference by ARCO with FOIA requests, and protective orders resulted in successful concealment from Sinclair. ARCO submits evidence, however, consisting primarily of the affidavit testimony of

---

**39.** The "fraudulent act" allegations are found entirely in ¶¶ 25, 26, 27 & 28 of Sinclair's Second Amended Complaint at pages 15–18. ¶ 25 alleges that ARCO wilfully filed false RMCARs and requested that these be confidential and obstructed to their release "when requests for the documents were filed by its purchasers under the Freedom of Information Act." ¶ 26 alleges that ARCO requested expungement of essential data from the public record and obstructed FOIA requests and did so "in order to fraudulently conceal from Sinclair and other purchasers of refined petroleum products the

overcharges which ARCO had imposed on those firms in violation of the DOE Regulations." ¶ 27 alleges that "to this day ARCO has withheld from the public domain the information which would enable Sinclair to determine the full nature and extent of ARCO's violation of the DOE Regulations, and the overcharges it has exacted from Sinclair." ¶ 28 alleges that ARCO, "in order to fraudulently conceal from Sinclair, and to prevent Sinclair from learning of, its cause of action against ARCO for overcharges," has insisted in other litigation that overcharge information be placed under court seal.

Mr. Morse [40] and Mr. Roll [41], that from at least 1980 forward,[42] Sinclair did not request nor obtain from ARCO nor the DOE the RMCARs or other DOE enforcement documents.[43] This evidence suffices to shift the burden to Sinclair to show that within the limitations period it received the false RMCARs and was fooled by them, or that it requested information and was prevented from getting it by ARCO. Such evidence would establish a factual dispute on the issue of causation under the "successful concealment" element.

Sinclair's evidence does not create such a factual dispute. Sinclair has submitted affidavits of Mr. Johnson, Sinclair's vice-president of administration, and Mr. Goldstein, its lawyer and past administrative law judge for the DOE, in support of its position. Neither of these contradicts directly or by inference the lack of causation.

Mr. Johnson establishes in his affidavit that he was intimately involved with the price control situation as part of his position with Sinclair, Johnson Aff. at ¶¶ 2 & 10 (Sinclair's Memo.Oppo., Exh. A). He states that Sinclair was unaware of its cause of action until July 14, 1987 when it received notice of the *Van Vranken* case, *id.* at ¶ 5.

After that date, Sinclair acquired information about the claims being asserted and received information sufficient to evaluate its cause of action, *id.* Prior to the *Van Vranken* notice, Sinclair was not aware of the DOE Notices of Proposed Violations or Proposed Remedial Orders against ARCO, *id.* at ¶¶ 8 & 9. Mr. Johnson states that it was never Sinclair's practice to monitor the information available throughout the entire DOE enforcement field office network, *id.* at ¶ 8.

Absent from Mr. Johnson's testimony is any statement that Sinclair reviewed and mistakenly relied upon ARCO's RMCARs. Also missing is any statement that Sinclair requested the RMCARs or other DOE enforcement documents under the FOIA and did not receive them due to ARCO's interference. In fact, Mr. Johnson's statement that Sinclair never had a practice to monitor the DOE information suggests that such a FOIA request was not made.

Mr. Goldstein's affidavit, Sinclair Memo. Oppo. Exh. F, suffers from several defects. His testimony is on "knowledge, information and belief" rather than on personal knowledge as required under Rule 56(e),

40. Mr. Morse testifies in pertinent part:
   In the course of my responsibilities, I was ordinarily apprised of inquiries or complaints by customers about Atlantic Richfield's compliance with DOE price regulations, and I was usually made aware of FOIA requests for information about Atlantic Richfield which were submitted to DOE. I do not recall being advised of any instance during the period August 1973 to July 19, 1988 in which representatives of Sinclair made inquiries or complaints to Atlantic Richfield regarding Atlantic Richfield's compliance with the mandatory petroleum price regulations. I do not recall being advised by DOE or its predecessors that Sinclair, Little America Refining Company, or Mr. Goldstein sought any information about Atlantic Richfield pursuant to FOIA before July 19, 1988.
   Morse Aff. at ¶ 25.

41. Mr. Roll testifies that he requested the DOE to search for FOIA requests made by Mr. Goldstein from the time Mr. Goldstein left the DOE until July 21, 1988, concerning ARCO records. Roll Aff. at ¶ 3 & Exh. 3. (Mr. Roll attaches as exhibits the correspondence between himself and his associate, and the DOE. Sinclair has not objected to the authenticity of these letters and we have no reason to doubt the same.) The

DOE's response establishes that the DOE has no record of such a request by Mr. Goldstein. *Id.* at ¶ 3 & Exh. 4. Mr. Roll also testifies that his associate asked the DOE to search from January 1, 1976 forward for FOIA requests concerning ARCO documents which requests were submitted by Sinclair, Larco, or any of their corporate affiliates, subsidiaries, or divisions. *Id.* at ¶ 5 & Exh. 6. The DOE's response establishes that Sinclair *et al* made no requests for ARCO records from January 1980 until August 10, 1988. *Id.* at ¶ 5 & Exh. 7.

42. ARCO has not offered evidence of whether the DOE in fact conducted a search from 1976 through 1979, nor of whether ARCO requested a search for the period of 1973 through 1975, the other years covered by the petroleum pricing regulations. We do not believe, however, that the absence of such evidence creates an inference in Sinclair's favor that Sinclair made FOIA requests during those periods.

43. Neither party has suggested that these documents ordinarily could be obtained from some source other than the DOE, the Federal Register, the public record, or ARCO; therefore, we assume no other avenues exist and were taken by Sinclair to get the information.

Fed.R.Civ.P. Some of his statements obviously lack foundation, such as: "ARCO has consistently attempted to withhold the information contained on these forms from its purchasers of refined petroleum products," Goldstein Aff. at ¶ 2; "The Steptoe and Johnson position is identical to the position which ARCO has taken over the past 15 years," *id.* at ¶ 4; and, "ARCO has consistently refused to permit any purchaser of refined petroleum products access to the forms which ARCO used to determine the prices which it charged those firms and has refused to permit its purchasers to examine complete and unexpurgated copies of the charges which the DOE made in [NOPVs and PROs] that ARCO has violated the DOE price regulations," *id.*

Even if these statements were admissible, however, they would not establish a causal connection between what ARCO did to conceal the overcharges and *Sinclair's* lack of knowledge about the cause of action. Mr. Goldstein does not testify that Sinclair got or attempted to get any information from ARCO or the DOE prior to 1988. Mr. Goldstein only testifies about what ARCO did to *others,* not to Sinclair. For instance, Mr. Goldstein offers evidence of ARCO's interference with USA Petroleum's FOIA request, *id.* at Exhs. 4 & 5. There is no causal link between that and Sinclair, however, because Mr. Goldstein does not assert that Sinclair timely knew of ARCO's interference with USA Petroleum's request and abandoned as futile its own attempt to get the information. It is also obvious from the June 1987 date of USA Petroleum's FOIA request that such a scenario is impossible, *id.*

Mr. Goldstein's evidence about the protective orders is also inadequate. There is no testimony that Sinclair attempted to get documents which were part of the record in those cases and was prevented from doing so by the protective orders. Further, the *Rookwood* protective order was not entered until March 17, 1986 and, therefore, could not have prevented Sinclair from obtaining any information about its own cause of action until after Sinclair's statutory period had expired. Nor can Sinclair establish causation through the *Van Vranken* protective order. That order was entered February 4, 1985, more than four years after the last overcharge could have occurred, on January 28, 1981. Further, Mr. Johnson has testified that Sinclair was not aware of the existence of the NOPVs and PROs, or, by implication, of the *Van Vranken* case itself, until after it received the class action notice on July 14, 1987, *id.* at ¶¶ 5, 8, & 9.

The affidavits and exhibits filed by Sinclair contain no evidence to contradict ARCO's evidence that causation is lacking. Sinclair has not met its burden of showing a factual issue on the "successful concealment" element.[44] This element lacking, the fraudulent concealment doctrine cannot operate to toll the statute of limitations and there is no need to address the due diligence element.[45] Accordingly, unless Sinclair's class action tolling argument is meritorious, summary judgment is appropriate for ARCO.

### III. Class Action Tolling Doctrine.

Sinclair asserts that its class member status in the *Van Vranken* case has tolled the limitations period on all of its ESA claims, making Sinclair's 1988 filing of this suit timely. ARCO asserts that Sinclair's current class member status excludes it from the benefits of class action tolling, and that in any event class action tolling would not be equitable.

Inherent in a class action suit are the possibilities that after the statutory limitations period on the class claims has expired the class will not be certified or some class

---

**44.** We also note that any facts establishing this causal link would originate with Sinclair; they would not be discovered from ARCO. Therefore, an argument that further discovery is necessary before ruling on the fraudulent concealment is unavailing.

**45.** We will briefly mention, however, that on this record which is barren of facts concerning industry standards and practices, we doubt it can be said as a matter of law that a duly diligent plaintiff timely would have discovered its cause of action. This appears more appropriately to be a jury question.

members will opt out of the suit in order to better pursue their individual claims. In either event, the class member desiring to proceed individually, either through intervention in the original suit or by filing a separate action,[46] will seek to do so at a time when he is technically barred by strict application of the statute of limitations. Strict application of the statutory period in these circumstances can be inequitable if the class member is cut off without a remedy despite his diligent pursuit of his claims through the class action and despite the fact that the defendant is not significantly prejudiced by simply changing the form of the suit from a class action to a joint or individual action. *See American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 554–55, 94 S.Ct. 756, 766–67, 38 L.Ed.2d 713 (1973).[47] The class action tolling doctrine was developed to prevent this inequity.

■ Under this tolling doctrine, the statutory limitations period is tolled for putative class members upon the filing of the class action complaint, preserving for individual class members the portion of the limitations period that remained at the time the class action was instituted. *See id.* at 538, 94 S.Ct. at 758. The limitations period resumes running, depending on the circumstance, either upon the denial of class certification, *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 354, 103 S.Ct. 2392, 2398, 76 L.Ed.2d 628 (1983), or upon the class member's decision to "opt out" of the class, *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1489 (9th Cir.1985).[48] The class member then must intervene or file a separate suit within the remaining limitations time or be barred.

The Supreme Court has emphasized the need to reconcile the purpose behind the tolling doctrine with the purpose behind statutes of limitation. The Court has explained that statutes of limitations are

> "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."

*American Pipe,* 414 U.S. at 554, 94 S.Ct. at 766 (quoting *Order of R.R. Tel. v. Railway Express Agency,* 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788.) The Court has determined that class action tolling is not inconsistent with this right-balancing purpose when

> a named plaintiff who is found to be representative of a class *commences a suit and thereby notifies the defendants* not only *of the substantive claims* being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. *Within the period set by the statute of limitations, the defendants have the essential information necessary to determine* both *the subject matter* and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.

---

**46.** If the class is not certified, the individual member can move to intervene as the plaintiff in the uncertified class action and maintain it as an individual suit. If the class member opts out, he may file a separate suit.

**47.** *American Pipe* is the seminal case on class action tolling. The Supreme Court addressed tolling to allow intervention in the original suit once the class was denied certification, and shed light on both the source and substance of adequate notice.

**48.** If the court certifies the class, at some point the class members may be given notice of their right to opt out of the class by a date certain or be bound by the judgment. If a class member elects to opt out pursuant to notice, the statute will resume running at that time. We are not aware of any case law concerning when the statute would resume running if the individual opted out prior to notice, but believe that should also be at his actual opt-out date because from that point onward he can no longer be said to be diligently pursuing his rights through the class action.

414 U.S. at 554–55, 94 S.Ct. at 766–67 (emphasis added). *See also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983) (class complaint notifies defendant).

The adequacy of the notice is critical to the tolling question. Justice Powell warned courts that abuse can result if courts do not ensure that the notice is adequate:

> The rule should not be read … as leaving a plaintiff free to raise different or peripheral claims following denial of class status.
>
> It is important to make certain … that *American Pipe* is not abused by the assertion of claims that differ from those not raised in the original class suit…. [W]hen a plaintiff invokes *American Pipe* in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that "concern the same evidence, memories, and witnesses as the subject matter of the original class suit," so that "the defendant will not be prejudiced."

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 355, 103 S.Ct. 2392, 2398, 76 L.Ed.2d 628 (1983) (Powell, J. concurring) (quoting *American Pipe*, 414 U.S. at 562, 94 S.Ct. at 770 (Blackmun, J. concurring)).[49]

■ Three requirements for adequate notice can be gleaned from *American Pipe* and *Crown, Cork & Seal*. First, the notice contemplated by the Supreme Court is notice that a class of persons, the individual class member included, is through that lawsuit exercising its right to recover from the defendant for specified harms it suffered due to specified acts by the defendant.[50] At the risk of overstating the obvious, the required notice is actual notice of the sued-upon claims, not some "notice," derivative by implication from the claim asserted, that these plaintiffs may have been overcharged as a result of other pricing violations at other times and that they may also see fit to sue for those at some time.[51] Second, the notice of the individual's claim is to come from the allegations of the complaint filed in the class action.[52] This is logical, for it is in the complaint that notice of the nature of the class claims sued upon is stated. The class action complaint defines the specific parameters of the class action,

**49.** In *Crown, Cork & Seal*, the black plaintiff had been a member of a class action against his employer for broad discrimination in hiring, discharges, job assignments, promotions, disciplinary actions and other terms and conditions of employment. After the class was denied certification, the plaintiff brought a separate suit against his employer for racially motivated harassment and discharge. The Court tolled the statute of limitations and held that the individual suit was not time-barred.

**50.** The suits do not have to be identical. *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir.1985). In *Tosti*, the court held the class action suit by a class of female police officer applicants for damages resulting from a City hiring policy sexually discriminatory under 42 U.S.C. § 1983, Title VII and the Fourteenth Amendment gave the City "ample notice of the nature of" Tosti's individual claims under § 1983 for the City's refusal to hire her. The court stated it was enough if the individual suit "involved the same allegations that were made in the class suit."

**51.** In many cases, a defendant will know at the time he acts, or at the time his actions injure another, that he may be legally liable. However, this knowledge alone does not subject him to a longer statute of limitations, nor does it impose on him a duty to preserve evidence concerning his actions. The duty to preserve only arises when he is sued. Once the statutory period expires, he is insulated from suit. To allow suit anyway, purely because the evidence of his culpability is overwhelming, or because he would not be prejudiced in his defense "by lack of witnesses or faded memories," undermines the statutory limitations concept.

**52.** The Fourth Circuit has emphasized that the class action complaint provides the notice, "It is, of course, in the *Lane* complaint where we search for notice to Bethlehem and the Unions that the allegations of discrimination made in the instant case were being asserted against them in 1971." *Davis v. Bethlehem Steel Corp.*, 769 F.2d 210, 212 (4th Cir.1985). Although the *Davis* court also suggested that such notice might come from discovery, *id.*, we believe the first notice requirement would limit that possibility to notice of individual claims arising out of the same basic acts and resulting in the same basic harm as those stated in the class action complaint. Also, discovery providing information of a different claim after the limitations period expired could not give the defendant "the essential information" "within the period set by the statute of limitations," the third requirement under *American Pipe*.

and thus the parameters of each individual member's claims.[53] Third, the notice contemplated is to be given within the limitations time. Thus, notice could come from amendments to the complaint which were made within the limitations period, or from amendments which relate back to the original date of filing under Rule 15, Fed.R. Civ.P.[54]

With these principles in mind, we now examine the applicability of class action tolling to the case at bar. This situation obviously differs from the tolling cases addressed above in that Sinclair is simultaneously involved as the plaintiff in this suit and as a class member in the *Van Vranken* class action.[55] In *Van Vranken*, the class has alleged in its original, first, and second amended complaints that in May 1976 ARCO changed its method of accounting for the cost of crude oil involved in interaffiliate transactions from an "internal transfer price" method to a "tax reference price" method, intentionally violating § 212.83(b) of the EPAA pricing regulations, which resulted in overcharges to the class from 1976 through 1981.[56] Based on

this regulatory violation, the *Van Vranken* class seeks to recover treble damages under § 210 of ESA. In the case at bar, Sinclair's allegations include the intentional EPAA violation alleged in *Van Vranken*, as well as other specific intentional EPAA violations resulting in overcharges to Sinclair and thus actionable under ESA § 210.[57]

■ ARCO has argued for summary judgment in part on the ground that Sinclair's current status as a *Van Vranken* class member excludes it from the benefits of class action tolling. We do not believe that summary judgment for ARCO can be granted on that ground. Because Sinclair is a *Van Vranken* class member, the filing of the original *Van Vranken* complaint tolled the statute of limitations for all of Sinclair's individual claims which were adequately set forth therein.[58] Because the *Van Vranken* class has been certified and because Sinclair has not been required to exercise its right to opt out of the suit,[59] the limitations period has not resumed run-

---

**53.** Under the "notice pleading" concept of Rule 8, Fed.R.Civ.P., the complaint will contain a "short and plain statement of the claim." Clearly the details of every class action member's cause of action will not be alleged, yet, the asserted claims must be apparent. This is demonstrated in *Davis*, 769 F.2d at 212, in which the Fourth Circuit court held that the class action complaint which contained a "laundry list of some 37 pattern and practice charges of [racial] discrimination," *id.*, but did not allege "any harm suffered by any individual," or "any instance of discrimination—relying solely on generalized allegations as to employment practices," *id.*, was inadequate to notify the employer of Davis' claim that he had "individually suffered from racial discrimination and had been denied the benefit of a working environment not charged with racial discrimination, thereby suffering 'humiliation, intense mental anguish, emotional and physical distress and great economic harm.'" *Id.* at 211.

**54.** *See Rose v. Arkansas. Valley. Environ. & Util. Auth.*, 562 F.Supp. 1180, 1194 (W.D.Mo.1983) (defendant had notice where individual suit allegations were same as allegations in second amended class action complaint).

Contrary to Sinclair's suggestion, relation back of amendments is not automatic. It only occurs when "the claim or defense asserted in the amended pleading arose out of the conduct,

transaction, or occurrence set forth or attempted to be set forth in the original pleading." Rule 15(c), Fed.R.Civ.P.

**55.** Judge Williams in *Van Vranken* has ruled that Sinclair is in fact a member of the *Van Vranken* class. Therefore it is not necessary to consider ARCO's class non-member argument.

**56.** We interpret the class complaint allegation that the recalculation was "for the express purpose of increasing the prices charged for covered products to plaintiffs and members of the class," Original Complaint at ¶ 36, First Amended Complaint at ¶ 36, to be an assertion of an intentional violation. The Second Amended Complaint expressly alleges a wilfull and knowing violation, at ¶ 50. All three complaints request treble damages.

**57.** These are listed *infra* at 915–17.

**58.** It is clear that at least Sinclair's ESA cause of action based on the alleged 1976 change of accounting procedures resulting in a miscalculation of the cost of crude oil, found in paragraph 16(f) of Sinclair's complaint, fits into this category.

**59.** Our understanding from the parties is that Sinclair opted out of the settlement class rather than the litigating class, and therefore never completely opted out of that litigation.

ning. Therefore, the period has not yet expired and Sinclair's claims are not too late.

If we were today to deny class action tolling because Sinclair is a class member, we would be ruling that all of Sinclair's claims are too late. However, if Sinclair were to opt out of *Van Vranken* tomorrow and we revisited this question, tolling would clearly be appropriate for those causes of action of which ARCO had adequate notice. Thus, we see no sense in barring today as "too late" a cause of action which is really "too early." [60]

We move, then, to the issue of notice. It is undisputed that the *Van Vranken* complaint gave ARCO notice of Sinclair's ESA claim for treble overcharges resulting from ARCO's alleged May 1976 change in the method of accounting for the price of crude oil from an "internal transfer price" method to a "tax reference price" method.[61] This is the claim expressly at issue in *Van Vranken* and set forth at paragraph 16(f) of Sinclair's complaint in this action. As to this claim, we find that the limitations period was tolled.

Also in this action, however, Sinclair asserts ESA causes of action based on the following alleged pricing regulation violations [62]:

(1) Beginning [63] in July 1977, ARCO improperly included increased import license fees in crude oil costs, Amended Complaint at ¶ 16(a); [64]

(2) Beginning in January 1974, ARCO failed to reduce its cost of crude oil to reflect the customs duty drawbacks it received from the government, *id.* at ¶ 16(b); [65]

(3) Beginning in February 1975, ARCO failed to reduce its cost of crude by the supplemental fee refunds it received from the government, *id.* at ¶ 16(c); [66]

(4) Beginning in April 1975, ARCO improperly calculated its cost of crude by changing its accounting practice from a "receipt of invoice" basis to a "passage of title" basis, *id.* at ¶ 16(d); [67]

(5) Beginning in August 1973 and lasting until January 1974, and again beginning in April 1975, ARCO improperly calculated the costs of transporting crude oil to

**60.** We recognize that this creates a duplicitous litigation problem. Whether and how this lawsuit should proceed is a separate question which we address *infra* at 919.

**61.** In a September 27, 1988 order denying the plaintiffs' motion to clarify the scope of damage claims, the *Van Vranken* court stated, "[T]his court agrees with ARCO that up until now this court and defendant have been under the impression that the amended complaint is limited to the 1976 crude oil recalculations." *Van Vranken,* Civ. No. C 79–0627 (slip op.) (9/27/88).

**62.** In his affidavit, Richard C. Morse identifies the DOE enforcement documents underlying the various Sinclair complaint allegations. Sinclair has not contested this affidavit. Based on our review of the Morse affidavit and the DOE documents exhibited therein, we have set forth more explicitly than in Sinclair's amended complaint, the separate violations underlying Sinclair's ESA causes of action.

**63.** Throughout this list, "beginning" is used to mean the month and year in which the violation first could have resulted in an overcharge, insofar as we can discern that date from the DOE enforcement documents.

**64.** According to the DOE enforcement documents, ARCO adopted the primary overstatement practice involved in 7/77 and applied it retroactively. This practice affected the "A" Factor calculation (The "A" Factor is a variable representing the cost of crude oil and is one of several identified general variables in the refiner price formula. Many subcalculations are involved in determining these categorical variables.) and was in violation of 10 C.F.R. §§ 212.-82. *See Proposed Remedial Order,* No. RARH00104 (5/16/80).

**65.** ARCO apparently engaged in this practice from 1/74 through 12/77, in violation of 10 C.F.R. § 212.83(c), which affected its calculation of the "A" Factor. *See* NOPV, No. RARH00103 (12/27/79); PRO, No. RARH00104 (5/16/80).

**66.** ARCO apparently engaged in this violation from 2/1/75 through 12/21/75, in violation of 10 C.F.R. § 212.83, which affected its calculation of the "A" Factor. *See* PRO, No. RARH00104 (5/16/80).

**67.** ARCO apparently made this change, violative of 10 C.F.R. § 212.83(c)(2), in 4/75 and applied it retroactively to 1/75, and remained in violation until 2/78. This affected calculation of the "A" Factor. *See* PRO, No. RARH00202 (9/3/80).

its domestic refineries, *id.* at ¶ 16(e); [68]
(6) Beginning in August 1973, ARCO included the same costs in two separate cost calculations, double-counting product costs, *id.* at ¶ 16(g); [69]
(7) ARCO overstated its nonproduct cost increases available for recovery in the areas of: refinery interest costs beginning in December 1974; [70] pollution control equipment costs beginning in August 1973, again in December 1974, and again in June 1979; [71] marketing costs beginning in December 1974, again in January 1977, and again in February 1980; [72] depreciation beginning in January 1977 and again in July 1978; [73] and refinery fuel costs beginning in January 1975 and again in June 1976,[74] *id.* at ¶ 16(h); [75]

(8) Beginning in March 1975, ARCO overstated its cost of crude oil by including foreign-shipped crude which was not destined for domestic refinery, *id.* at ¶ 16(i); [76]
(9) Beginning in December 1976, ARCO overstated the amount of cost increases which it could allocate to gasoline from the cost bank it maintained for products other than gasoline, *id.* at ¶ 16(j); [77]
(10) Beginning in December 1976, ARCO overstated its costs of crude by improperly including financing costs on vessels it owned, *id.* at ¶ 16(k); [78]
(11) Beginning in April 1976, ARCO improperly reallocated costs attributable to decontrolled products to gasoline, *id.* at ¶ 16(1); [79]

**68.** ARCO engaged in this violation apparently from 8/73 until 1/75, and from 4/75 until at least 9/80. This violation affected the "A" Factor calculation and was in violation of § 212.83(c). *See* PRO, No. RARH00202 (9/3/80).

**69.** This violation involved ARCONOL, a component of gasoline. ARCO allegedly included it in the B Factor calculation for costs of gas and in the B Factor calculation for increased costs of ARCONOL, in violation of §§ 212.82, 212.83 and 212.126. ARCO made this violation in a 5/79 refiling which incorrectly recalculated ARCO's costs from 8/73 through 2/79 and double-counted from 8/73 through 11/76. *See* PRO, RARK00601 (8/20/81).

**70.** This violation of § 212.87 occurred in various forms and due to various errors from 12/74 through at least 12/79. *See* PRO, No. RARL00201 (11/27/81).

**71.** One violation of § 212.87(c)(5)(ii) related to hydrodesulferization units and occurred from 12/74 through at least 11/81; a violation of § 212.126 concerning wastewater treatment fees occurred in 6/79; a violation of § 212.87(C)(5)(ii) concerning duplicitous costs occurred from ARCO's original filing through at least 11/81. *See* PRO, No. RARL00201 (11/27/81).

**72.** ARCO violated § 212.87 several times: ARCO used an incorrect accounting method from 12/74 onward; in 1/77 ARCO changed to an improper unit method of accounting for depreciation costs associated with marketing assets and recalculated 5/73 costs; and, in 2/80 ARCO incorrectly restated its marketing costs for 12/78 through 10/79. *See* PRO, No. RARL00201 (11/27/81).

**73.** ARCO violated § 212.83(c)(2)(iii)(E) from 1/1/77 until at least 11/27/81; in addition, in 6/77 ARCO recalculated its 1973 depreciation improperly, and implemented that incorrect amount in 7/78. *See* PRO, No. RARL00201 (11/27/81).

**74.** From 1/75 until at least 11/27/81 ARCO violated § 212.87 by using a 4/73 rather than a 5/73 figure; that violation increased in severity when ARCO made an addition error implemented from 6/76 until at least 11/27/81; also ARCO used the wrong price to value residual fuel from 1/75 through 12/80. PRO, No. RARL00201 (11/27/81).

**75.** All of these violations affected the "N" Factor calculations.

**76.** In violation of § 212.83(c)(2)(iii)(C), ARCO changed from a "landed" to a "loaded" basis of reporting in 3/—; thereafter ARCO refiled its RMCARs for months from 8/73 to 2/75, so that all RMCAR's reflect incorrectly the crude cost. This violation affected the A Factor calculation. *See* PRO, No. RARH00201 (9/30/83).

**77.** This violation of §§ 212.83(c) and (d) is reflected in ARCO's retroactive reallocations of banked costs found in forms it submitted on 12/20/76, 7/7/78, 3/27/79, 4/25/79, and 5/30/79. These violations affected the A and H Factor calculations. *See* NOPV, No. RARM01402 (12/17/79).

**78.** This violation of § 212.85 occurred from 12/31/76 until 12/31/80. This improper figure affected the A Factor calculation. *See* PRO, No. RARH00203 (9/30/83).

**79.** This violation of § 212.83(d) affected the "H" factor and is reflected in ARCO's revision to its

(12) Beginning in March 1979, ARCO improperly excluded decontrolled products from the denominator of the pricing equation, *id.* at ¶ 16(m); [80]

(13) Beginning in August 1973, ARCO failed to use the equal application/deemed recovery rule in determining gasoline cost recoveries, *id.* at ¶ 16(n).[81]

*See* Sinclair Amend.Comp. at 9–14.[82]

Each violation that Sinclair has alleged involves a different specific definition or provision concerning the proper calculation of the maximum allowable price under the refiner price rule. As shown by the dates gleaned from the DOE enforcement documents, ARCO allegedly first acted to violate these pricing regulations and thus overcharge Sinclair at different points in time throughout the regulatory period, evidencing the independent nature of each of ARCO's decisive acts. In light of this observation and the DOE's practice, apparent from the NOPVs and PROs of record, of focusing on the specific detailed pricing regulations at issue when determining if overcharges have occurred, we believe that each of these decisive acts led to a separate ESA cause of action accruing at the time the specific decisive act first resulted in an overcharge to Sinclair.

The *Van Vranken* original, first, and second amended class complaints [83] contain absolutely no mention, either expressly or by reasonable inference, of the violations which Sinclair alleges in this action.[84] The *Van Vranken* allegations only concern the

June 1976 change from a "internal transfer price" method to a "tax reference price" method of accounting for the price of crude oil. As a result, these *Van Vranken* pleadings did not give ARCO notice of the other claims Sinclair seeks to assert in this action.

The *Van Vranken* plaintiff class also filed a proposed third amended complaint, however, which does include the claims Sinclair seeks to assert here. We have examined that proposed complaint and believe that in these circumstances it cannot serve to give ARCO adequate notice to toll the statute of limitations on Sinclair's individual claims. First, because the motion to amend was denied,[85] the third amended complaint cannot meet the first requirement of giving ARCO notice of the class claims being asserted in the class action and thus of the individual claims likely to be at issue if the class is not certified or if the individual class member later decides to opt out. In fact, the denial of the motion gives notice to the contrary: that these violations are *not* being sued upon in the class action. Second, this amendment was not proposed until November 16, 1988 and, therefore, could not put the defendant on notice within the period of limitations, the third requirement under *American Pipe.* Thus, even if it could be said that rejected pleadings can provide notice for class action purposes, any "notice" coming from this proposed pleading would not be timely.[86]

---

books and records on various dates after 4/21/76. *See* PRO, No. RARM01401 (10/24/79).

**80.** This violation of § 212.83(c)(2) occurred from 3/79 through 12/80 and affected the "V" and "R" Factors. *See* PRO, No. RARH00204 (9/30/83).

**81.** ARCO engaged in this violation of §§ 212.-83(a)(3) and (c)(1) and 212.92(a) from 8/73 until at least 12/79. *See* PRO, No. RARB00307 (12/17/79).

**82.** Sinclair also asserts that ARCO improperly calculated the "A", "B", "N" and "H" Factors in the pricing equation [¶ 18], and that ARCO used these false calculations as the basis for increasing the price of gasoline [¶ 19]. These general and causal allegations do not individually add

to the basis for the ESA claims already asserted by Sinclair in its other allegations.

**83.** These complaints clearly qualify for relation back under Rule 15, Fed.R.Civ.P.

**84.** The *Van Vranken* complaint and amended complaints contain no broad allegation of pricing violations that arguably would have given notice to ARCO that more regulations had been violated and were at issue in the class action.

**85.** *Van Vranken,* Order Denying Motion to Amend (6/7/89) (Williams, J.).

**86.** We are not persuaded that the stay of the *Van Vranken* proceeding from shortly after the complaint was filed in March 1979 until some time in 1985 weighs heavily in favor of Sinclair.

Even if at some point in the future Judge Williams allows the proposed third amendment,[87] we believe it will remain inadequate to serve as notice to ARCO. With all due respect to Judge Williams, we disagree that the amendment would relate back to the date of original filing. Federal Rule of Civil Procedure 15(b) allows relation back of amended pleadings only if the amendment concerns claims which "arise out of the conduct, transaction, or occurrence set forth in the original pleading." The conduct set forth in the *Van Vranken* original, first, and second amended complaints is very specific—a May 1976 change in the method of accounting for the price of crude oil involved in interaffiliate transactions from an "internal transfer price" method to a "tax reference price" method which resulted in an overcharge. The ESA violations set forth in the proposed third amended complaint do not arise out of this 1976 "occurrence" or "transaction." The DOE enforcement documents show that none of the other decisive acts causing overcharges involve this change in accounting methods, nor were any of them taken in May 1976, nor did any of them first result in an overcharge in June 1976.[88] Nor can it be said

that those overcharges arose out of the same "conduct" as the 1976 change in accounting overcharge, unless "conduct" is taken to mean "overcharges" in general. We do not believe such a broad and vague interpretation is warranted in this complex regulatory environment spanning seven and a half years.

The decisive acts alleged in the proposed amendment support independent ESA causes of action insufficiently related to the 1976 accounting change and resulting overcharge to be considered part of the same transaction, occurrence, or conduct. These causes of action are time-barred unless the parties expressly or impliedly agree to their trial. Absent such consent, permission to amend the complaint to conform to such evidence is improper. *See* Rule 15(b), Fed.R.Civ.Pro.

The argument has also been made that no prejudice to ARCO would result by allowing these claims because the evidence necessary to litigate the claims still exists and to a great extent overlaps with the proof of the June 1976 accounting change overcharge. Even assuming that the evidence is the same,[89] this notion of lack of

---

At the time of the stay, the class complaint only gave notice of the 1976 accounting violation and could not support a belief by an individual class member that his other claims would be resolved in that lawsuit. Where an amendment to include such claims within the limitations period was impossible due to the stay, we believe the individual plaintiff should have filed an independent action to protect his rights. We also note the lack of any evidence that the *Van Vranken* plaintiff class would have filed the third amended complaint within the limitations period but for the stay. The history of *Van Vranken* suggests otherwise: the second amendment was filed in July 1985 and only raised the 1976 claim; the class was certified in March 1986, and was prepared to settle the entire case in 1987; and, the third amendment was not proposed until November 1988, more than three years after the stay was lifted.

**87.** In denying the motion to amend the federal district court of California stated,

the Court finds that if, as plaintiffs assert, the discovery and evidence relevant to plaintiffs' recovery of damages under the Second Amended Complaint includes susbtantially [sic] all of the proof necessary to adjudicate the additional overcharges alleged in the Third Amended Complaint, then ARCO would

not be subject to undue prejudice if plaintiffs were permitted to recover all overcharges, since there can be no surprise or lack of notice to ARCO as far as this discovery and evidence is concerned.... If plaintiffs are successful in [discovering enough to prove the violations asserted in the proposed third amended complaint], then a motion to amend to conform the pleadings to the evidence would be appropriate pursuant to Rule 15(b), Fed.R.Civ.P. If the facts relevant to adjudicating damages under the Second Amended Complaint also demonstrate additional overcharges under other theories of regulatory violation, then the general rules of federal pleading dictate that those theories also be applied to the facts in determining the total recovery available to plaintiffs and the Class. *Van Vranken*, Order at 4–5 (6/7/89) (Williams, J.) (denying motion to amend).

**88.** See nn. 63–81, *supra.*

**89.** It appears the plaintiff does have to establish the allowable maximum price in order to prove he has in fact been overcharged, *Longview Ref. Co. v. Shore*, 554 F.2d 1006, 1017–18 (Temp. Emer.Ct.App.1977), which is likely to reveal other pricing regulation violations if they exist. We do not believe the proof regarding intent or wilfulness is likely to be the same, however.

prejudice is inaccurate. Prejudice will occur if the court removes a time bar where the plaintiff has slept on his rights. A plaintiff sleeps when he fails to timely assert his claims in a lawsuit, thus putting the defendant on notice to defend. This is so despite the fortuitous existence of evidence sufficient to litigate the claim. Properly applied, the class action tolling doctrine maintains the balance of rights set forth in the limitations statute. Tolling without proper notice flies in the face of *American Pipe* and *Crown Cork & Seal.*

Based on the foregoing discussion, we find that the *Van Vranken* class action did not timely put ARCO on notice to defend Sinclair's ESA causes of action based on pricing regulation violations other than the alleged June 1976 improper change in the method of accounting for the cost of crude oil in interaffiliate transactions. As a result, the statute of limitations on these claims was not tolled and expired no later than January 28, 1985.

## CONCLUSION

Sinclair's treble damage claims are subject to a four year statute of limitations. Therefore, absent tolling, these claims expired no later than January 28, 1985. None of Sinclair's claims were tolled under a fraudulent concealment theory because there is uncontroverted evidence of record that ARCO's fraudulent acts did not cause Sinclair's lack of discovery of its cause of action. Thus, there was no "successful concealment" of the claims. Sinclair's status as a *Van Vranken* class member entitles it to the benefits of tolling for any claim of which ARCO had "notice" from the *Van Vranken* original, first amended or second amended complaint. The only claim alleged in the present action which satisfies this notice requirement is Sinclair's ESA treble damage claim based on the allegedly improper June 1976 change in the method of accounting for the cost of crude oil in interaffiliate transactions. Because this claim is identical to the claim asserted in the pending *Van Vranken* class action, and duplicitous litigation is inappropriate, Sinclair must elect which suit it wishes to maintain.

Accordingly,

IT IS HEREBY ORDERED that summary judgment in ARCO's favor is GRANTED on all counts of Sinclair's complaint except the ESA cause of action based on the paragraph 16(f) allegations concerning the 1976 change in accounting for the price of crude oil involved in interaffiliate transactions. As to that cause of action summary judgment is DENIED.

Because this lawsuit involves precisely that violation which is at issue in *Van Vranken* and the simultaneous maintenance of two suits is inappropriate,

IT IS FURTHER ORDERED that within thirty days of the date of this order Sinclair must make an election to proceed on its 1976 ESA claim either as a class member in *Van Vranken* or as the plaintiff in this suit. Failure to elect will result in a dismissal of this case with prejudice.